# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

Nº 11-CV-00110 (JFB)

PETER DAVID YOUNG,

Petitioner,

VERSUS

PEOPLE OF THE STATE OF NEW YORK,

Respondent.

**MEMORANDUM AND ORDER**
December 20, 2012

JOSEPH F. BIANCO, District Judge:

Peter David Young ("Petitioner" or "Young") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. On June 3, 2008, following a jury trial, Petitioner was convicted of one count of driving while intoxicated as a felony (N.Y. Veh. & Traf. § 1192.3), and one count of aggravated unlicensed operation of a motor vehicle in the first degree (N.Y. Veh. & Traf. § 511.3(a)(i)). Petitioner was sentenced to two indeterminate terms of imprisonment, from one and one-third years to four years. These were to run concurrent to each other, but consecutively with a previous and unrelated conviction for Grand Larceny in the Third Degree. In total, Petitioner is serving an aggregate sentence of three and one-third years to ten years imprisonment.

In the instant petition, Petitioner only challenges the more recent convictions, alleging four violations of his constitutional rights: (1) the evidence was insufficient to support the jury's verdict, and thus, the verdict was against the weight of the evidence; (2) Petitioner was denied his right to choose counsel; (3) Petitioner was denied effective assistance of counsel; and (4) the court improperly dismissed Petitioner's case as a traffic ticket violation.

For the reasons set forth herein, the Court finds that Petitioner has not demonstrated any basis for habeas relief. The Court therefore denies the petition in its entirety on the merits.

I. BACKGROUND

A. Facts

The following facts were adduced from the petition, as well as from the state court trial and appellate record.

1. The Accident

At approximately 7:40 p.m. on August 4, 2006, Michael Sunkin ("Sunkin") and Jonathan Green ("Green") were stopped at a red light on Smithtown Boulevard at the intersection of Annetta Drive in Smithtown, New York. (T. 239-40.)[1] They were driving to Green's house approximately a quarter of a mile away having previously stopped at a liquor store to buy preparations for a party at Green's home. (T. 239, 266-267.) Although there was alcohol in Sunkin's car, there were no open containers, and neither Sunkin nor Green had recently been drinking. (T. 250, 252, 286.)[2] The two men were both wearing their seatbelts, and aside from conversing with one another, neither was using or otherwise distracted by any communicative technology. (T. 241, 254, 266, 287.)

Sunkin testified to the following events at trial. While stopped at the red light, he "heard screeching" and saw a Jeep Cherokee Sport approach from his rear view mirror. (T. 241-42.) The vehicle rear-ended the back left of Sunkin's green Isuzu Rodeo. (T. 239, 241.) The collision pushed his car forward fifteen feet and caused approximately $2,500 to $3,000 in damage. (T. 249, 338.) Nearby at a Getty gas station, Alan Frank Roncs ("Roncs") and Arthur Rommel ("Rommel") also observed the accident. (T. 322-24, 334.)[3]

Sunkin and Green exited their vehicle before the driver of the white Jeep exited his. (T. 337.) Rommel, who ran out to the scene of the accident, arrived before the Jeep driver exited his car. (T. 334, 337.) Sunkin and Green both testified that there was only one person in the white Jeep. (T. 242, 268.) Sunkin described him as older, not heavy, with gray hair, paint on his clothes, and a rugged appearance. (T. 244.) Green identified the driver of the Jeep as Petitioner at trial. (T. 275-76.)

2. The Flight

Shortly thereafter, Sunkin and Green observed the driver of the white Jeep take off on foot heading south on Smithtown Boulevard in the opposite direction of traffic. (T. 243, 268-69.)[4] Rommel testified that the driver walked away quickly at a pace similar to a jog. (T. 335.) Roncs, who until that point was still at the gas station, ran within two feet distance of the driver and told him to stop. (T. 324, 329.) Sunkin and Green also shouted for the driver to turn back around. (T. 261, 263.) While the driver of the white Jeep was walking south, an ambulance unrelated to the accident passed by with its sirens on. (T. 243.) The driver

---

[1] The following facts are derived from the pre-trial hearing transcript ("H.") and the trial transcript ("T."). The pre-trial hearing took place on November 7, 2007, and the trial took place from May 28, 2008 to June 3, 2008.

[2] Sunkin testified to having had a drink earlier in the day. (T. 252.)

[3] Roncs worked as an auto mechanic at a shop that is part of the Getty gas station. (T. 321-22.) He was outside talking to an attendant when he observed the accident. (T. 334.) Rommel was also an auto mechanic at a different service station, and was visiting his friend Roncs at the Getty gas station. (T. 331-33.) At the time of the accident, Rommel was playing a game of solitaire inside the station; he observed the accident through a window after hearing the sound of locking breaks. (T. 333-34.)

[4] Although identified by Green as the driver of the Jeep (T. 275-76), Petitioner denies driving the vehicle and challenges the sufficiency of the evidence as to his identification presented at trial. (Appellant's Supplemental Br. 3, ECF No. 9-13.)

put his hands up in the air, turned around, and began walking north towards the collision. (T. 243-44.)

Gary Anderson ("Anderson") was driving in the opposite direction at the time of the accident. (T. 344.) Anderson's various statements – to 911, to the police, and in both his grand jury and trial testimony – were inconsistent as to whether he witnessed the collision or simply the Jeep driver exiting his vehicle. (T. 345, 354-57.) At trial, Anderson testified that he saw the driver of the white Jeep walk south after the accident, claiming ninety-five percent certainty as to his identification. (T. 345.) Anderson observed that the man's "pants were falling down around his ankles" and that "[h]e was staggering and swaying" as he walked. (T. 346.) Anderson also called his brother, Albert John Anderson ("AJ Anderson"), then fire chief for Nesconset Fire District. (T. 347-48, 358-59.) Although the accident was not an area falling within AJ Anderson's field of responsibility, he offered to help. (T. 361.) Anderson turned around towards the scene of the accident, parked, and exited his vehicle to offer assistance. (T. 347-49.)

After initially walking south, the driver of the white Jeep turned around and began walking back north. (T. 243-44.) Instead of stopping at the accident scene or making any form of verbal response, the driver walked past Sunkin, Green, Anderson, Rommel, and the accident scene, and continued walking north. (T. 244, 269, 335.) All four men believed the driver was intoxicated; Rommel testified that the driver seemed "dazed" and acted as if he was deaf or did not understand English. (T. 337.) Sunkin described the driver as "wobbling around and just, off balance, and when he put his hands up in the air . . . it was just kind of a real indicator [that he was intoxicated]." (T. 245.) Green noted that the driver was not walking straight, did not stop to ascertain whether there were any injuries, and later claimed that he had not been driving the Jeep. (T. 284.) In his statements to 911, Anderson described the driver as intoxicated. (T. 347.)

After the Jeep driver walked past the accident scene, Sunkin and Green watched him walk towards a restaurant called the Radio Grill. (T. 244, 270.) At this point, Green noticed that Sunkin seemed shaken up and was claiming that his neck hurt him; Green told Sunkin he was going to follow the driver alone. (T. 269.) Sunkin stayed at the scene of the accident. (T. 246, 269.) Sunkin dialed 911, telling the operator, "I think he's drunk," and sat back down in his Isuzu waiting for an ambulance and police to arrive. (T. 245.)[5] The witnesses, including Sunkin and Rommel, testified that they could no longer see the driver once he entered the Radio Grill. (T. 244, 335.) Anderson called his brother again and waited outside the Radio Grill for his brother to arrive. (T. 349-50.)

Green followed the driver into the Radio Grill. (T. 270, 273.) Once inside the restaurant, Green saw the driver go into the men's restroom. (T. 273.) Instead of following him inside, Green spoke briefly to a few customers and the owner, Carol Buchmann ("Buchmann"), whom he knew; Green informed them that he had been in an accident and that the driver who had hit him was in the restaurant's bathroom. (T. 273-75, 301.)

Green then saw the driver leave the bathroom. (T. 274.) Buchmann recognized

---

[5] Sunkin was later taken to St. Catherine's of Siena where he complained of a neck injury. (T. 246-47.) Doctors treated the muscle stretching resulting from the abrupt neck movement he sustained during the accident. (T. 247.)

3

the man as "Pete,"[6] a man who had come to her restaurant on approximately five prior occasions. (T. 304-05.) When the man identified as Pete came out, he made eye contact with Buchmann and Green; he then ran through the kitchen, an area typically off-limits to patrons. (T. 274, 307-08.) Green continued to pursue Pete, walking out of the front door and to the back of the Radio Grill; he saw Pete walking through the parking lot. (T. 276.) Buchmann followed Green outside and spoke with the fire chief, AJ Anderson, who had just arrived. (T. 308, 350.) Buchmann testified that she saw the vehicles that had been involved in the accident and recognized the white Jeep as one that Pete had driven before. (T. 314-15.)

After speaking with Buchmann, AJ Anderson followed Green and Pete. (T. 308, 351.) He observed Green yell at Pete to stop and to return to his car. (T. 365.) AJ Anderson described Pete at this time as moving fast and "swaying back and forth." (T. 365.) When Green saw the fire marshal appear, he asked him to stop the driver but AJ Anderson replied that he could not do anything until the police arrived. (T. 277.) Green and AJ Anderson continued to follow Pete as he kept walking. (T. 280-82.) At one point, Pete told Green that he was simply walking and not the person whom Green thought him to be. (T. 294.)

### 3. The Police Arrive On the Scene

Police Officer Jeffrey Harkins ("Officer Harkins") was the first officer to respond to the scene of the motor vehicle collision after receiving a call of an accident with physical injury. (T. 376-77.) Officer Harkins made the casual observation that the driver of the Jeep was not on the scene and began gathering information from Sunkin. (T. 377-78.) Police Officer Michael J. Goralski ("Officer Goralski") was next to arrive. (T. 408-9.) Police Officer Vincent Liberato ("Officer Liberato") arrived last. (T. 504.) The three officers had nearly twenty-seven years combined experience with the Suffolk County Police Department. (H. 7-8; T. 373, 405, 501.) They each observed that the white Jeep was "blocking traffic" and "stopped in the middle of the intersection." (T. 377, 409, 505.) Officer Harkins proceeded to the Fourth Precinct to impound the Jeep and to process the paperwork necessary to complete both the accident and police incident reports. (T. 381.) Officer Goralski followed Green and Pete based on witnesses' descriptions of where they were going. (T. 409-10.)

Approximately half a mile from the scene of the accident, Officer Goralski saw a fire chief's truck driving on the shoulder beside two men who were walking on the sidewalk along Route 347, where pedestrian traffic was "minimal." (H. 11-14, 19.) The two men were Green and the Jeep driver, with Green walking behind the driver. (T. 364.) Officer Goralski initially observed that the man whom Green was following was "wobbly" on his feet and "[h]is pants kept falling down." (H. 13; T. 413-14.) He approached the men in his vehicle, put his lights on, and pulled up next to them. (H. 13; T. 411.) Officer Goralski first spoke to Green, who stated that the other man had rear-ended him and then fled the scene. (H. 14; T. 411-12.)

Officer Goralski, who was trained in driving-while-intoxicated ("DWI") cases, decided against administering a field sobriety test because, from his perspective, Petitioner was "clearly intoxicated." (T. 405, 418.) He testified, "I didn't want him to get hurt trying to do anything he couldn't do." (T. 418.) Officer Goralski based his opinion

---

[6] At trial, Buchmann identified "Pete" as Petitioner. (T. 304.)

4

on the man's unsteadiness, his glassy eyes, and the odor of alcohol emanating from him. (H. 15.) Officer Goralski also noted that it took the driver a long time to "get out . . . the few words he uttered . . . ." (T. 414.) Those words, once spoken, were, "[h]e hit me. I didn't hit him." (H. 18; T. 413.) At one point, Officer Goralski helped the driver lean up against his police car in order to maintain his balance and keep his pants up. (H. 15; T. 414.)

Officer Goralski asked the Jeep driver for his identification; when he saw that the driver "couldn't quite get the license out" on his own, Officer Goralski removed a New York State identification card from the man's wallet. (H. 43; T. 413-14, 512.) The card was not a driver's license. (T. 415-16.) Officer Goralski ran the identification. (H. 15; T. 416.) On running the card, an active arrest warrant came up; Officer Goralski placed the driver under arrest and administered *Miranda* warnings. (H. 15-16; T. 418.) At trial, Officer Goralski identified the Jeep driver as Petitioner. (T. 412.)

Other officers who were present on the scene made similar observations to Officer Goralski concerning the Jeep driver's state of sobriety. For instance, Officer Liberato, who also had DWI training, observed the driver struggle to remove his wallet. (T. 503, 512.) He described the man as being "very unsteady on his feet," "stuttering," and "slurr[ing his] speech." (T. 512.) In Officer Liberato's opinion, the driver was intoxicated. (T. 512-13.) Officer Liberato identified Petitioner as the driver of the Jeep in court. (T. 511.)

4. Events at the Fourth Precinct

Officer Goralski transported Petitioner to the Fourth Precinct. (T. 418-19.) During the ride, Petitioner did not speak to Officer Goralski. (H. 40.) The officer opened all four windows in his police car to air out the strong smell of alcohol emanating from Petitioner. (H. 40; T. 420, 430-31.)

Once at the precinct, Officer Goralski began processing the arrest by filling out a prisoner activity log. (T. 431-32.) Sergeant Waterson asked Petitioner whether he had any pain or injury; Petitioner indicated that he did not. (T. 489.) The log made mention of "no apparent injury" and "red eyes." (T. 432.)

Petitioner was then brought to the processing room where Officer Goralski prepared a form called the Alcohol Influence Report. (T. 433-34.) Part of the process of completing this form required Officer Goralski to explain the rights and implications of refusing to submit to a chemical or breath test. (H. 21-22; T. 434.) He re-read this portion of the form at the pre-trial hearing and again at trial. (H. 25; T. 436-37.)[7] After reading the form to Petitioner, Officer Goralski then asked him whether he would agree to submit to a breath test. (H. 21.) This request was made at 8:26 p.m.; Petitioner made no response. (H. 24, 26.) Petitioner did not indicate that he understood what was read to him and did not ask Officer Goralski to re-read the form. (T. 437.) Instead, he stared at Officer

---

[7] The warning, in relevant part, states:

> You may refuse to take the chemical test or any portion thereof but refusal to submit to a chemical test or any portion thereof will result in immediate suspension and subsequent revocation of your license or operating privilege . . . . Your refusal to submit to a chemical test or any portion thereof can be introduced in evidence against you at any trial proceeding or hearing resulting from this arrest.

(T. 436-37.)

Goralski and made no other response. (T. 437.) Officer Goralski recorded the inquiry as a refusal. (H. 26.) The process was repeated at 8:30 p.m., but Officer Goralski received no response other than staring. (H. 27; T. 437-38.) Once again, Officer Goralski understood this to be a refusal. (H. 27.) This time, Officer Goralski asked Petitioner to initial the Alcohol Influence Report; Petitioner did not comply and did not say anything further. (T. 438.) Officer Goralski again understood the staring to be a refusal. (T. 438.) At one point, Petitioner briefly stated, "I'm not taking any testing, no comment." (H. 48.)

After this refusal, Officer Goralski proceeded to administer *Miranda* warnings. (T. 438-39.) The waiver questions were read at 8:45 p.m. and 9:00 p.m. (T. 439.) Petitioner answered, "[n]o comment" when asked whether he understood his rights, "[n]o lawyer" in response to whether he wished to contact a lawyer, and "[n]o comment" when asked whether he wished to speak without a lawyer present. (T. 439.)

Officer Goralski next proceeded to the arrest worksheet. (T. 439.) Petitioner refused to cooperate in providing any pedigree information except when asked for a nickname or alias, to which he responded, "Mickey Mouse." (T. 441.) Officer Goralski then filled out the vehicle and passenger information based on computer information and information gathered through other means. (T. 440-42.) While filling out the third page of the paperwork, Officer Goralski testified that Petitioner spontaneously "stated he was drinking beer." (H. 49; T. 442.)

Once the paperwork was completed, Officer Goralski invoiced Petitioner's property. (T. 442.) Results of the search incident to arrest included Petitioner's wallet and an ignition key found in a front pants pocket that was used to open the seized Jeep's door and start the vehicle. (H. 19-20; T. 419, 442-43, 465-66.) Officer Goralski also inventoried the items found in the impounded Jeep. (T. 442-43.) A separate pair of keys was found in the vehicle. (T. 398, 469.) No alcohol was found in the Jeep. (T. 391-92.) It was discovered that Petitioner was not the registered owner of the Jeep. (T. 387.) There were no reports that the Jeep was stolen. (T. 388.)

One of the last documents to be filled out by Officer Goralski was the arraignment cover sheet, on which he noted Petitioner's lack of cooperation. (T. 471-72.) At no time were full body or stand-up photos taken of Petitioner or of the accident scene. (T. 400-2, 461-63.)

B. Procedural History

1. State Court Proceedings

a. Pre-trial Proceedings

On March 2, 2007, Petitioner was accused of driving while intoxicated as a felony and aggravated unlicensed operation of a motor vehicle in the first degree. (Indictment No. 786-2007, ECF No. 9-3 at 4-5.) On March 8, 2007, by a special information, Petitioner was accused of driving while intoxicated in violation of Section 1192.3 of the New York Vehicle and Traffic Law, for which his license or privilege to operate a motor vehicle in New York had been suspended or revoked on August 21, 2001. (Special Information No. 786-2007, ECF No. 9-3 at 7.) On March 21, 2007, Petitioner appeared before Judge James Hudson for arraignment at the County Court of Suffolk County. (Notice of Arraignment, ECF No. 9-3 at 13.) Pursuant to Article 18-b of the County Law, James W. Corrigan ("Corrigan") was assigned as

Petitioner's defense counsel. (Letter Dated Mar. 21, 2007, ECF No. 9-3 at 14.)

On April 10, 2007, Corrigan filed a request for a bill of particulars and a demand for discovery. (Def.'s Req. dated Apr. 10, 2007, ECF No. 9-3 at 17-21.) The prosecution filed a response on April 24, 2007, providing Petitioner's medical records, criminal history, Department of Motor Vehicle Records, and the Police Accident Report, Alcohol/Drug Influence Report, and Arrest Worksheet; the prosecution also made a request for discovery. (People's Resp. dated Apr. 24, 2007, ECF No. 9-3 at 24-84.) As per Corrigan's April 10 request, on April 30, 2007, Judge Hudson granted the defense's request for an investigator not to exceed $1,000 to be paid pursuant to County Law Section 722-c. (County Ct. Order dated Apr. 30, 2007, ECF No. 9-3 at 85.)

Corrigan moved to dismiss the indictment on the grounds that the evidence before the grand jury was not legally sufficient to establish the offenses charged and that the grand jury proceedings were legally defective. (County Ct. Order dated May 21, 2007, ECF 9-4 at 2.) On May 21, 2007, Judge Hudson denied the motion, finding the evidence presented to the grand jury legally sufficient and the instructions given to the grand jurors proper. (County Ct. Order dated May 21, 2007, ECF 9-4 at 2.)

On July 17, 2007, Corrigan filed a motion to suppress evidence and for hearings to be held. (Def.'s Notice of Mot. dated July 17, 2007, ECF No. 9-4 at 3-10.) The prosecution filed an affirmation in opposition dated August 10, 2007. (People's Affirmation dated Aug. 10, 2007, ECF. No. 9-4 at 15-21.) The court issued a Decision and Order on October 2, 2007, granting certain hearings and denying Petitioner's application to suppress the identification evidence. (County Ct. Order Dated Oct. 2, 2007, ECF No. 9-4 at 25-27.)

On November 7, 2007, Corrigan and Petitioner appeared in the County Court of Suffolk County before Judge Ralph Gazzillo. Corrigan put the pretrial plea bargain offer on the record,[8] whereupon Judge Gazzillo asked Petitioner if he understood the consequences he might face if he chose to reject the plea bargain – namely, that the maximum penalty was seven years imprisonment on the grand larceny charge and four years on the driving while intoxicated charge with the possibility of consecutive sentencing. (H. 3, 5.) Petitioner stated he did not understand why he would not receive concurrent sentencing, but still chose to reject the offer and proceed with the pretrial hearing. (H. 4-6.)

Following this, the parties discussed four issues: (1) the *Huntley*[9] issue, *i.e.*, assessing the voluntariness of Petitioner's "He hit me" statement to Officer Goralski; (2) the *Dunaway*[10] issue, *i.e.*, assessing whether there was probable cause to arrest Petitioner

---

[8] The plea agreement rejected by Petitioner provided that, for the charge of driving while intoxicated, Petitioner could plead guilty as charged and be sentenced to imprisonment for six months and probation for five years. (H. 3.) On the separate unrelated indictment, Petitioner could plead guilty to grand larceny and receive the same sentence to be served concurrently, plus a cap of no more than $3,600. (H. 3.) Furthermore, Petitioner could receive time served based on his existing credit and be released on his own recognizance prior to sentencing. (H. 4-5.) This offer would be revoked once the hearing ended. (H. 4.)

[9] A *Huntley* hearing is a hearing "to determine the admissibility of a statement made by a criminal defendant." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) (citing *People v. Huntley*, 15 N.Y.2d 72, 77-78 (1965)).

[10] A *Dunaway* hearing is a pre-trial proceeding employed by New York state courts to determine whether police had probable cause to arrest. *See Dunaway v. New York*, 442 U.S. 200, 208 (1979).

for allegedly driving while intoxicated; (3) the seizure issue concerning the car key recovered from Petitioner's pants pocket; and (4) the refusal issue, *i.e.*, Petitioner's decision not to take a chemical test that would have determined his blood alcohol content. (H. 6-51.) After Officer Goralski testified at the pretrial hearing, the court made the following determinations as to each of the four issues: (1) it denied the suppression of Petitioner's statement to Officer Goralski; (2) it held that there was probable cause to arrest for driving while intoxicated; (3) it denied suppression of the keys on the basis that they would assist in the seizure of the vehicle; and (4) it denied suppression of Petitioner's refusal to take a chemical test. (H. 55-56.)

On January 24, 2008, Judge Gazzillo sentenced Petitioner for his unrelated conviction of grand larceny in the third degree to an indeterminate term of imprisonment from two years to six years. (S. January 24, 2008 at 19.)[11] Four months later, on May 27, 2008, Petitioner again appeared before Judge Gazzillo for jury voir dire. (T. 1.) Petitioner was reminded that consecutive sentencing was a possibility after trial; Petitioner still chose to plead not guilty. (T. 7.) The parties proceeded to discuss *Sandoval*[12] and *Molineux*[13] issues, whereupon the court determined that: (1) with regards to Petitioner testifying, the prosecutor must limit any *Sandoval* inquiry on cross-examination; and (2) with regards to Petitioner's other traffic violations, his leaving the scene of the accident, and his outstanding warrant, only the flight should be included in the narrative. (T. 10-19.)

b. Trial and Sentencing

Petitioner proceeded to trial by jury on May 28, 2008. Throughout the course of the four-day trial, the prosecution presented ten witnesses. (T. 236-519.) Petitioner did not testify at trial. (T. 527.) Following trial, Corrigan moved to dismiss under New York Criminal Procedure Law Section 290.10 for insufficient evidence. (T. 530-34.) The court reserved decision. (T. 535.) During the charge conference, which took place after both parties rested their case, the court charged as follows: "The defendant did not testify in this case. I charge you that the fact that he did not testify is not a factor from which any inference unfavorable to the defendant may be drawn." (T. 604.) That afternoon, the jury deliberated. (T. 626.) The jury reached a verdict, finding Petitioner guilty as charged on both counts. (*See* T. 633-34.)

Petitioner was sentenced on July 1, 2008. (S. 1.)[14] During the hearing, Judge Gazzillo commended Corrigan for his handling of "an indefensible case." (S. 2-3.) The prosecutor asked that Petitioner receive a sentence of one and one-third years to four years and for each count to run consecutive to Petitioner's previously imposed sentence for grand larceny, based on Petitioner's numerous arrests and misdemeanor convictions dating back to 1969. (S. 3-4.)[15]

---

[11] "S. 1/24/08" refers to the transcript of the sentencing proceeding held on January 24, 2008.

[12] A *Sandoval* hearing is an evidentiary hearing that is held by the trial court to determine whether, if the defendant decides to testify, a prior conviction may be used to impeach his credibility. *See People v. Sandoval*, 34 N.Y.2d 371, 374 (1974).

[13] A *Molineux* hearing determines the admissibility of evidence of prior bad acts committed by a defendant. *See People v. Molineux*, 61 N.E. 286, 293 (1901).

[14] "S." refers to the transcript of the sentencing proceeding held on July 1, 2008.

[15] Petitioner's convictions include a Class A Misdemeanor for reckless endangerment in the second degree to which he pled guilty on August 2, 1976 and was sentenced to a term of one year. (Repository, ECF 9-3 at 49.) On February 5, 1986, Petitioner pled guilty to operating a motor vehicle

Defense counsel requested concurrent sentencing with the grand larceny conviction. (S. 4.) Petitioner's only remark was, "I have nothing to say." (S. 4.) Judge Gazzillo stated he was familiar with Petitioner's arrogance and unrepentant attitude, and was particularly upset by his lack of cooperation with the probation department. (S. 5.) The judge then sentenced Petitioner according to both defense counsel and the prosecution's requests, *i.e.*, to two concurrent, indeterminate terms of imprisonment from one and one-third years to four years, to run consecutively with the previously imposed conviction for grand larceny in the third degree under Indictment Number 195-07. (S. 7-8.) The court also imposed a surcharge of $520 and revoked Petitioner's driver's license. (S. 8.)

### c. Appeals

Petitioner, represented by Legal Aid, appealed his conviction to the Appellate Division, Second Department, raising five grounds: (1) the evidence at trial did not prove guilt beyond a reasonable doubt and the verdict was against the weight of the evidence; (2) defense counsel's failure to request a lesser offense constituted ineffective assistance of counsel; (3) the trial court erred in failing to charge the jury with the lesser included offense; (4) the prosecutor's summation denied Petitioner a fair trial; and (5) the sentence was unduly harsh and excessive. (Appellant's Br. 9-28, June 18, 2009, ECF No. 9-12.)

On June 19, 2009, Petitioner wrote a letter to the Appellate Division seeking permission to file a *pro se* supplementary brief. (Letter dated June 19, 2009, ECF No. 9-12 at 50.) The Appellate Division granted Petitioner permission on August 11, 2009. (Appellate Division Order dated Aug. 11, 2009, ECF No. 9-13 at 2-3.) After a series of requests for an enlargement of time, the *pro se* supplemental brief was filed on March 26, 2010. (*See* Appellant's Supplemental Br., ECF No. 9-13 at 20-48.)

In a decision dated June 29, 2010, the Appellate Division, Second Department, affirmed Petitioner's conviction, holding there was legally sufficient evidence to establish Petitioner's guilt beyond a reasonable doubt and that the guilty verdict was not against the weight of the evidence. *People v. Young*, 74 A.D.3d 1374, 1374 (N.Y.S.2d 2010). The court rejected Petitioner's other contentions. *Id.* at 1374-75. The court also held that these issues were unpreserved for appellate review. *Id.*

In a letter to the New York Court of Appeals dated July 8, 2010, Petitioner's Legal Aid attorney sought leave to appeal to the Appellate Division's June 29, 2010 decision pursuant to New York Criminal Procedure Law Section 460.20. (Letter dated July 8, 2010, ECF No. 9-13 at 65.) The prosecution's letter in opposition stated that no meritorious issues could be discerned for appeal. (Letter dated Aug. 17, 2010, ECF No. 9-13 at 67-68.) Specifically, respondent argued that guilt had been proven beyond a reasonable doubt; operation of a vehicle and intoxication were established without substantive challenge; the record showed

---

while impaired by alcohol; his license was revoked. (Repository, ECF 9-3 at 53.) On June 19, 2001, Petitioner pled guilty to driving while intoxicated as a Class U Misdemeanor and was sentenced to three years probation. (Repository, ECF 9-3 at 53.) Petitioner was resentenced on March 18, 2004 following his violation of probation. (Repository, ECF 9-3 at 54.) On November 4, 2004, Petitioner pled guilty to aggravated unlicensed operation of a motor vehicle as a Class U Misdemeanor and criminal possession of stolen property as a Class A Misdemeanor. (Repository, ECF 9-3 at 55.) On January 24, 2008, Petitioner was sentenced to an indeterminate term of imprisonment from two to six years for grand larceny in the third degree. (S. January 24, 2008 at 19.)

that even though defense counsel did not specifically request that the jury consider a lesser offense, counsel had in fact considered and rejected making such a request; and the allegations of perjury were discounted on appeal. (Letter dated Aug. 17, 2010, ECF No. 9-13 at 67-68.) On December 7, 2010, the Court of Appeals denied Petitioner's application for leave to appeal. *People v. Young*, 15 N.Y.3d 957 (2010). Petitioner did not seek certiorari from the United States Supreme Court.

2. The Instant Petition

Petitioner filed a *pro se* Petition for Writ of Habeas Corpus on January 3, 2011. Four grounds were raised in the petition. First, Petitioner argued that his conviction was based on circumstantial evidence and lacked eyewitness testimony, scientific proof of intoxication, and proof of vehicle ownership. (Pet. at 5.)[16] Second, Petitioner claimed he was denied his right to choose counsel for trial and his right to testify at trial. (Pet. at 6.) Third, he argued that he was not identified with one hundred percent accuracy at trial. (Pet. at 8.) Finally, Petitioner claimed Corrigan told him his driving while intoxicated charge had been verbally dismissed. (Pet. at 9.) Respondent filed a memorandum of law in opposition to the petition on July 5, 2011. (Resp. Br. 1.)[17] The Court has fully considered the submissions and arguments of the parties.

II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal

---

[16] "Pet." refers to Young's petition filed in this case. The Court cites to the page numbers assigned by ECF.
[17] "Resp. Br." refers to the memorandum of law filed before this Court by Respondent on July 5, 2011.

principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Additionally, while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

III. DISCUSSION

For the reasons discussed below, this Court denies Petitioner habeas relief because each of Petitioner's claims are procedurally barred. Notwithstanding this fact, the Court proceeds to analyze the merits of Petitioner's claims in an abundance of caution and concludes they are without merit.

A. Procedural Bar

1. Exhaustion

As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida*, 549 U.S. 327, 333 (2007) (citing *Fay v. Noia*, 372 U.S. 391, 435-38 (1963)), petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Daye v. Att'y Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)) (quotation marks omitted) (alteration in original).

Passage through the state courts, in and of itself, "is not sufficient." *Picard*, 404 U.S. at 275. To provide the State with the necessary "opportunity," the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Duncan*, 513 U.S. at 365-66. "A petitioner has fairly presented his claim only if he has informed the state court of both the factual and the legal premises of the claim he asserts in federal

court." *Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir. 2003) (quoting *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997)) (internal quotation marks omitted). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye*, 696 F.2d at 191-92. To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192 (footnote omitted).

### 2. State Procedural Requirements

Like the failure to exhaust a claim, the failure to satisfy the state's procedural requirements will deprive the state courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (quoting *Coleman*, 501 U.S. at 735) (emphasis omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are . . . to be deemed exhausted." *DiGuglielmo v. Smith*, 366 F.3d 130, 135 (2d Cir. 2004). Notably, for exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes*, 118 F.3d at 139 (quoting *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)).

Even where a plaintiff properly exhausts his claim, however, exhaustion "does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (citing *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Coleman*, 501 U.S. at 744-51)). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Gray*, 518 U.S. at 162 (citations omitted).

The procedural bar rule in the review of applications for writs of habeas corpus is based on the comity and respect accorded to state judgments. *See House v. Bell*, 547 U.S. 518, 536 (2006). The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Coleman*, 501 U.S. at 730-31.

Once it is determined that a claim is procedurally barred under state rules, a federal court still may review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Id.* at 750. A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478,

496 (1986). To overcome procedural default based on miscarriage of justice, petitioner must demonstrate that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt'" and would require "'new reliable evidence . . . that was not presented at trial.'" *House*, 547 U.S. at 537 (quoting *Schlup v. Delo*, 513 U.S. 324, 327 (1995)).

3. Application

"The burden of proving exhaustion lies with the habeas petitioner." *Cartagena v. Corcoran*, No. 04-CV-4329 (JS), 2009 WL 1406914, at *3 (E.D.N.Y. May 19, 2009). The Court concludes that Petitioner has not met that burden with respect to three of his claims. As discussed *supra*, Petitioner raised the following five grounds on direct appeal to the Appellate Division: (1) the evidence at trial did not prove guilt beyond a reasonable doubt and the verdict was against the weight of the evidence; (2) defense counsel's failure to request a lesser offense constituted ineffective assistance of counsel; (3) the trial court committed error in failing to charge the jury with the lesser included offense; (4) the prosecutor's summation denied Petitioner a fair trial; and (5) the sentence was harsh and excessive. (Appellant's Br. 9-28, June 18, 2009, ECF No. 9-12.) Petitioner's *pro se* brief did not add any new legal arguments, but rather supplemented his first claim. (*See* Appellant's Supplemental Brief, ECF No. 9-13 at 20-48.) Thus, three of Petitioner's claims here were not raised on his direct appeal. Those claims are: (1) Petitioner's right to choose counsel; (2) ineffective assistance of counsel as to Petitioner's right to testify and divergence in trial strategy; and (3) the ticket dismissal claim. Because the three claims that were not raised on direct appeal were not properly exhausted, they are not reviewable by this Court.

In addition, although Petitioner did exhaust his sufficiency of the evidence claim, this claim is procedurally barred from review. First, the Appellate Division ruled that Petitioner's "contention that the evidence was legally insufficient to establish his guilt of operating a motor vehicle while under the influence of alcohol is unpreserved for appellate review," and alternatively, was meritless. *Young*, 74 A.D.3d at 1374 (internal citations omitted). Because the Appellate Division provided a plain statement that this claim was unpreserved for appellate review under established New York law, this claim cannot be reviewed because it was decided on an adequate and independent state procedural ground. *See Coleman*, 501 U.S. at 729-31. When a state court relies on an independent and adequate state law ground – such as, in this case, failure to preserve the issue for appeal – federal habeas review is foreclosed. *See Glenn v. Barlett*, 98 F.3d 721, 724-25 (2d Cir. 1996) (finding that failure to preserve issue for appeal was adequate and independent state law ground precluding federal habeas review). This is true even if the state court rules in the alternative on the merits of petitioner's claims. *See id.* at 724-25; *see also Green*, 414 F.3d at 294 ("[E]ven when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted.").

In order for a petitioner to overcome a procedural bar, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Petitioner cannot clear the bar here.

Petitioner has not provided any explanation for his failure to properly

exhaust his claims for his right to choose counsel, ineffective assistance of counsel, and the ticket dismissal claim. (Pet. at 6, 9.) Moreover, Petitioner has failed to demonstrate any cause of prejudice for his failure to exhaust, and he has not demonstrated that a fundamental miscarriage of justice will take place if the Court fails to consider the procedurally defaulted claims. Similarly, Petitioner has failed to demonstrate cause for his procedural default on the sufficiency claim, nor has he demonstrated prejudice or that a fundamental miscarriage of justice will result given the overwhelming evidence of his guilt. Accordingly, these claims are not reviewable by this Court. Even if these claims could be deemed properly before this Court, however, they are without merit for the reasons discussed below.

B. Merits Analysis

1. Sufficiency of the Evidence Claim

Petitioner claims that the evidence presented at trial was legally insufficient to support his conviction. (Pet. at 5, 8.)[18] For the reasons set forth below, the Court finds that Petitioner's claim is without merit.

a. Legal Standard

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well established. A petitioner "bears a very heavy burden" when challenging evidentiary sufficiency in a writ of habeas corpus. *Einaugler v. Supreme Court of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997) (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)) (internal quotation marks omitted).

A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (quoting *Jackson*, 443 U.S. at 324)); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60,

---

[18] Respondent argues that a claim as to the weight of the evidence is a state law claim and not the basis for habeas review. (*See* Resp. Br. at 4-5.) Although Petitioner does not specifically raise this claim in his petition, to the extent that such a claim exists, this Court agrees with respondent that the claim must fail. A "weight of the evidence" claim is based on state law. *See Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."). The Court cannot consider a purely state claim on federal habeas review. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law . . . ."). Therefore, to the extent Petitioner raises a claim that his conviction was against the weight of evidence, the Court cannot review it. However, even construed as a sufficiency claim, it is without merit, as discussed *infra*.

66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326).

A habeas petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Flowers v. Fisher*, 296 Fed. App'x 208, 210 (2d Cir. 2008) (quoting *Jackson*, 433 U.S. at 324). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

b. Application

Petitioner argues that the evidence was legally insufficient to support his convictions of driving while intoxicated as a felony and aggravated unlicensed operation of a motor vehicle in the first degree because the only evidence pointing to Petitioner's guilt was circumstantial. (Pet. at 5.) Petitioner argues that he was not the owner of the white Jeep, no blood or breath tests were administered, and no witness saw him driving. (Pet. at 5.) He also contends that no witness identified him with one hundred percent certainty at trial.[19] (Pet. at 8.) Therefore, Petitioner argues the evidence convicting him was insufficient.

Respondent argues that the absence of direct evidence is not an infirmity, and the non-ownership of the vehicle is irrelevant. (Resp. Br. 5.) Respondent points to the identification testimony of the eyewitnesses on the scene and further notes that issues concerning the reliability of eyewitness testimony and credibility assessments are matters for the jury to decide, not the federal court. (*Id*. at 4-5.)

Under the standard enunciated in *Jackson v. Virginia*, this Court finds the evidence taken together is legally sufficient for a rational jury to have concluded beyond a reasonable doubt that Petitioner was guilty of driving while intoxicated as a felony and aggravated unlicensed operation of a motor vehicle in the first degree. *See Jackson*, 443 U.S. at 319 (asking whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). Specifically, contrary to Petitioner's allegations, there were five witnesses to the accident, Michael Sunkin, Jonathan Green, Alan Frank Roncs, Arthur Rommel, and Gary Anderson, who also testified as to Petitioner's flight from the scene of the collision. (T. 241-43, 268, 323-24, 334-35, 338, 345, 354-57.) Moreover, Green followed Petitioner from the accident scene, through the Radio Grill, and was present at the scene of Petitioner's arrest. (T. 275-76, 411-12, 418.)

Although Petitioner emphasizes the lack of physical evidence connecting him to the crime, "a conviction may be based upon circumstantial evidence and inferences based upon the evidence . . . ." *Strauss*, 999 F.2d at 696 (citations omitted). The circumstantial evidence in this case overwhelmingly points to Petitioner's participation in the crime. In particular, the jurors heard testimony that (1) the driver of the white Jeep was not able to stop at a red light, (T. 241); (2) Petitioner had operated the white Jeep on a previous occasion, (T. 315); (3) the keys belonging to the Jeep were located in Petitioner's front pants pocket, (T. 419, 442, 466); (4) the driver of the Jeep attempted to flee the accident scene

---

[19] For example, Sunkin testified at trial that the driver of the Jeep weighed around 200 pounds. (T. 251.) Petitioner weighed 290 pounds. (Appellant's Supplemental Br. 18, ECF No. 9-13.)

15

despite five witnesses observing the accident, (T. 241-43, 268, 323-24, 334-35, 338, 345, 354-57); (5) two witnesses dialed 911 in belief that Petitioner was intoxicated, (T. 245, 346-47); (6) Petitioner appeared dazed, (T. 337); (7) Petitioner was staggering and not walking straight, (T. 245, 284, 346, 365); (8) Petitioner was unable to keep his pants up, (T. 346, 414); (9) Petitioner raised his arms after hearing an ambulance siren, (T. 243); (10) Petitioner ignored the witnesses at the accident scene, (T. 244, 269, 284 335); (11) Petitioner attempted to escape through the Radio Grill after making eye contact with Green and Buchmann, (T. 274, 307-8); (12) Petitioner denied being the driver once apprehended, (T. 284, 294); (13) Petitioner experienced difficulty maintaining his balance when being questioned by police, (T. 414); (14) Petitioner stated that the driver of the Isuzu hit him, (T. 413); (15) Petitioner was identified as "intoxicated" by two police officers who received training for driving while intoxicated cases, (T. 418, 503, 512-13); (16) Petitioner struggled to produce his identification card from his wallet, (T. 413-14, 501-3, 512); (17) Petitioner smelled strongly of alcohol, (T. 420, 430-31); (18) Petitioner slurred his speech, (T. 414, 512); (19) Petitioner had bloodshot eyes, (T. 432); (20) Petitioner admitted to police that he had been drinking beer, (T. 442); (21) Petitioner told police his name was Mickey Mouse, (T. 441); (22) Petitioner otherwise failed to cooperate with police, including but not limited to failing to perform a chemical test to determine his blood alcohol content, (T. 437-38, 441-42, 471-72); and (23) Petitioner was identified at trial by one witness, Green, who had seen him at the scene of the accident, (T. 275-76.) Therefore, even absent direct testimony, a rational trier of fact could have concluded based on this evidence that Petitioner was guilty beyond a reasonable doubt.

In sum, the Court concludes that the evidence was legally sufficient to convict Petitioner beyond a reasonable doubt on the charged crimes of driving while intoxicated as a felony and aggravated unlicensed operation of a motor vehicle in the first degree.

2. Right to Choose Counsel Claim

Petitioner next claims that he was denied the substitution of his assigned attorney at trial, thereby depriving him of his right to choose counsel. (Pet. at 6.) For the reasons discussed *infra*, this Court disagrees.

a. Legal Standard

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel applies to the states through the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963). Despite such protections, indigent defendants do not have an absolute right to counsel of their own choosing. *See Wheat v. United States*, 486 U.S. 153, 159 (1988) ("[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."); *see also United States v. Mills*, 895 F.2d 897, 904 (2d Cir. 1990). Moreover, "once counsel is assigned, the Sixth Amendment right to counsel of choice attaches and counsel may not be removed arbitrarily." *Childs v. Herbert*, 146 F. Supp. 2d 317, 322 (S.D.N.Y. 2001).

The Supreme Court has not specified a standard whereby a refusal to substitute counsel would constitute a violation of the Sixth Amendment. *Linton v. Bradt*, 775 F.

Supp. 2d 574, 582 (E.D.N.Y. 2011). Nevertheless, during trial, "a defendant does not have the unbridled right to reject assigned counsel and demand another." *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972) (citations omitted). Instead, in order to violate the Sixth Amendment, the defendant must make a showing of good cause entitling him to substitute counsel. *Id.* While conflicts of interest, breakdowns in communication, and other irreconcilable conflicts constitute grounds for substitution, *id.*, tactical disputes do not. *See United States v. White*, 174 F.3d 290, 296 (2d Cir. 1999) (stating that defendant's "disagreement with his attorney over whether to file certain motions, to pursue certain evidentiary leads, to object to the introduction of certain evidence at trial, and to call certain witnesses at trial . . . does not give rise to a conflict of interest between the defendant and his attorney").

### b. Application

Here, Petitioner has not shown good cause for the substitution of assigned counsel. Not only has Petitioner failed to demonstrate that he was actually denied dismissal of his counsel, but even assuming such a motion was made or a continuance sought to replace counsel, Petitioner does not provide any grounds supporting a dismissal of his counsel. Although Petitioner claims he fired Corrigan "in [his] first trail [sic] but the judge wouldn't grant it," Petitioner has failed to articulate a reason to be given a different attorney. (Pet. at 6.) Moreover, there is nothing in the record showing the judge's denial of a request to replace counsel, or any other evidence supporting Petitioner's claim.

A review of the record suggests, at most, that Petitioner and Corrigan disagreed over trial strategy. For instance, Corrigan's trial strategy consisted of presenting different theories, all of which denied that Petitioner drank of the day of the accident. (T. 252, 285, 291, 312-13, 352, 369, 445, 514.)[20] However, Petitioner's retyped statement of facts admitted that he spent time drinking in a bar, but denied driving that day. (Appellant's Supplemental Br. 3, ECF No. 9-13.) Case law is clear that differences in strategy do not warrant the replacement of counsel. *See e.g., White*, 174 F.3d at 296 (disagreement over filing motions, objecting to evidence, and calling witnesses not sufficient for purposes of replacing counsel); *Calabro*, 467 F.2d at 985-86 (disagreement over entering a stipulation not grounds to replace counsel). Even if Petitioner were unsatisfied as to Corrigan's strategy at trial, any replacement of counsel would be purely tactical. Thus, Petitioner was not denied his right to counsel.

### 3. Ineffective Assistance of Counsel Claim

Petitioner argues that he was denied effective assistance of counsel because (1) Petitioner and his attorney did not "see eye to eye," and (2) his attorney refused to let him testify at trial. (Pet. at 6.) Having carefully reviewed the record, this Court rejects Petitioner's ineffective assistance of counsel claim.

### a. Legal Standard

A defendant has a right to testify in his own defense under the Fifth, Sixth, and Fourteenth Amendments. *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987). Furthermore,

---

[20] For example, Corrigan asked several witnesses whether they had personal knowledge that Petitioner might have injured his head during the course of the accident. (T. 252, 450.) Corrigan also suggested that diabetics could exhibit an odor of alcohol on their breach even if they did not consume alcohol and that red eyes could result from someone who had allergies, a head injury, or was crying. (T. 451-52, 458.)

17

every defendant must be informed of his right to testify by his attorney. *Rega v. United States*, 263 F.3d 18, 21 (2d Cir. 2001) (citing *Brown v. Artuz*, 124 F.3d 73, 74 (2d Cir. 1997)).

Under the standard promulgated by *Strickland v. Washington*, a petitioner is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," 466 U.S. 668, 688 (1984), and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, "constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of trial counsel's actions under all circumstances, keeping in mind that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Id.* at 319 (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id.* at 588 (quoting *Strickland*, 466 U.S. at 690) (internal quotation marks omitted). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* (quoting *Strickland*, 466 U.S. at 690-91).

The second prong focuses on prejudice to the petitioner. The petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, "reasonable probability" means that the errors were of a magnitude such that they "undermine confidence in the [proceeding's] outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695).

The Court proceeds to examine Petitioner's claim, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004) (citing *Strickland*, 466 U.S. at 687).

### b. Application

### i. Failure to See Eye to Eye

Petitioner's claim that he was denied effective assistance of counsel because he disagreed with appointed counsel fails to satisfy the *Strickland* standard. Similar to Petitioner's claim that he was denied his right to choose counsel, Petitioner does not explain the grounds supporting his claim that he was denied effective assistance of counsel.

A review of the record suggests that Petitioner and counsel disagreed over appropriate trial strategy. Assuming *arguendo* that this was so, it was not objectively unreasonable for Corrigan to pursue the strategy he employed at trial. Under the standard of "heavy" deference that this Court must give to judgments made by counsel, *Greiner*, 417 F.3d at 319 (quoting *Strickland*, 466 U.S. at 691), Corrigan's trial strategy was not an unreasonable decision. A review of the trial record demonstrates that Corrigan acted as a persistent advocate for the Petitioner. In various pretrial proceedings, Corrigan moved to dismiss Petitioner's indictment and filed motions to suppress evidence. (County Ct. Order dated May 21, 2007, ECT 9-4 at 2; Def.'s Notice of Motion dated July 17, 2007, ECF No. 9-4 at 3-10.) At trial, Corrigan thoroughly cross-examined the prosecution's witnesses, moved to dismiss pursuant to Criminal Procedure Law Section 290.10, and gave a reasoned closing statement. (T. 250-62, 285-95, 312-14, 315-16, 328-30, 337-41, 352-57, 369-71, 386-402, 445-82, 484-95, 499-501, 513-18, 530-34, 535-74.) In short, Corrigan conducted a thorough and highly competent defense, and was even commended for his efforts by the judge at sentencing.[21] This evidence, coupled with the lack of evidence adduced by Petitioner in support of his claim, does not support a finding of ineffective assistance of counsel under *Strickland*'s first prong. Thus, this Court disagrees with Petitioner's contention that his attorney was somehow deficient under *Strickland* when he conducted his trial strategy.

### ii. Right to Testify

With regard to Petitioner's claim that he did not receive effective assistance of counsel because he was not permitted to testify, this Court finds that Petitioner's argument lacks merit. Generally, "[t]he burden of ensuring that the defendant is informed of his right to testify belongs to defense counsel." *Wells v. Miller*, No. 02-CV-5778(JBW), 03-MISC-0066(JBW), 2003 WL 23185759, at *15 (E.D.N.Y. Oct. 23, 2003). Thus, "any allegation by the defendant that counsel failed to meet that burden must satisfy *Strickland*'s two-prong test for assessing the effectiveness of counsel's performance." *Id.* A petitioner can satisfy the first *Strickland* prong (performance) "by demonstrating that his attorney either (i) failed to inform him that he had the right to testify and that the decision to do so ultimately belonged to him, or (ii) refused to accept the defendant's decision to testify and did not call him to the witness stand." *Id.* (citing *Artuz*, 124 F.3d at 77). Petitioner shows neither here.

Specifically, Petitioner points to no evidence showing that his attorney "failed to inform him that he had the right to testify,"

---

[21] At sentencing, Judge Gazzillo stated, "you took what most lawyers would consider an indefensible case and, by your hard work and demonstrably mastering the facts, evidence, and paperwork, as well as your seductive power of persuasion, you came very close to performing something of a legal miracle." (S. 2-3.)

or that Corrigan "refused to accept [his] decision to testify." *See Artuz*, 124 F.3d at 80 (citing *United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992)). Petitioner simply states that his attorney "refuse[d] to put [him] on the stand." (Pet. at 6.)

Even if this Court were to accept Petitioner's argument that Corrigan's performance was deficient, thereby clearing the first *Strickland* factor, Petitioner cannot satisfy the second prong of *Strickland*, *i.e.*, he cannot "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In particular, Petitioner provides no detail as to what he would have testified had he been able to, or how such testimony might have affected or changed the trial outcome. (Pet. at 6.) Moreover, there was ample evidence against Petitioner at trial, consisting of the testimony of ten witnesses (five of whom observed the accident, and two of whom dialed 911 in belief that Petitioner was intoxicated) as well as the testimony from several police officers that had observed Petitioner that day. (T. 237-519.) Because Petitioner cannot satisfy either of *Strickland*'s two prongs, his right-to-testify ineffective assistance of counsel claim must be denied.

### 4. Ticket Dismissal Claim

Petitioner argues that a "lower court dismissed [his] D.W.I. ticket verbally in court." (Pet. at 9.) As a threshold matter, this claim was not properly exhausted because Petitioner failed to raise the issue in state court. *See* 28 U.S.C. § 2254(b)(1)(A). Therefore, Petitioner's claim is procedurally barred. Petitioner has furthermore failed to demonstrate cause for the default, prejudice resulting therefrom, or that the failure to consider this claim would result in a miscarriage of justice. *See Coleman*, 501 U.S. at 750; *see also Gray*, 518 U.S. at 162.

Notwithstanding this fact, Petitioner's claim is also patently without merit. Other than a conclusory statement that his attorney told him his ticket was dismissed, Petitioner provides no evidence in the record to support this claim. (Pet. at 9.) Thus, there is no basis to conclude that Petitioner was subject to double jeopardy. *See* U.S. Const. amend. V. Accordingly, habeas relief on this ground is denied.

### IV. CONCLUSION

For the reasons set forth herein, this Court finds that the Petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. All of Petitioner's claims are plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: December 20, 2012
       Central Islip, New York

\* \* \*

Petitioner is proceeding *pro se*. Respondent is represented by Thomas Spota, District Attorney of Suffolk County, by Michael Herman Blakey, 200 Center Drive, Riverhead, NY 11901.